**GULF, T. & W. RY. CO. et al. v. ORR.**
**(No. 9768.)**

(Court of Civil Appeals of Texas. Ft.
Worth. March 4, 1922.)

1. **Railroads ⬦5½, New, vol. 6A Key-No.**
**Series—Company not suable for injury dur-**
**ing federal control.**

A railway company is not liable upon a
cause of action for injury arising during fed-
eral control and as a result of operation by the
Director General.

2. **Railroads ⬦443(1)—Evidence insufficient**
**to show negligence in killing mule at crossing.**

In an action for injury to a mule struck
by a motorcar at an open crossing established
at plaintiff's request, making the statute re-
quiring the company to fence its track inap-
plicable, evidence *held* insufficient to establish
negligence on the part of the employees operat-
ing the car.

Appeal from Young County Court; W. H.
Reeves, Judge.

Action by Dan Orr against the Gulf, Texas
& Western Railway Company and others.
From judgment for plaintiff, defendants ap-
peal. Reversed and rendered in part; re-
versed and remanded in part.

Arnold & Arnold, of Texarkana, for appel-
lants.

Marshall & King, of Graham, for appellee.

DUNKLIN, J. The Gulf, Texas & Western
Railway Company and its receiver and John
Barton Payne, Federal Agent of Railroads,
have appealed from a judgment in favor of
Dan Orr for the value of a mule, which was
killed by a motorcar operated by the defend-
ants' employees.

A hand car propelled by an electric motor,
and running at the rate of 8·or 10 miles an
hour, collided with the mule at an open pri-
vate crossing which had been established on
plaintiff's land at his instance and for his
sole benefit, the defendants' right of way be-
ing fenced on either side up to the crossing,
and as a result of the collision the mule was
so badly crippled that it became necessary
for the plaintiff to kill him.

The evidence shows without controversy
that the crossing where the accident happen-
ed was put in for plaintiff's accommodation
and at his request, in order to enable his
stock to pass from his pasture land on one
side of the track to that on the other. At
first gates were provided at the crossing on
either side of the track, but at the earnest
solicitation ·of the plaintiff, and in order to
avoid the inconvenience of having to open
the gates whenever he desired his stock to
pass over the crossing, the crossing was made
an open crossing, thus enabling plaintiff's
stock to pass at will. The evidence further
shows that the accident occurred on a dark

night about 10 o'clock, and no one witnessed
it except the employees who were riding on
the car at the time. One of those men,
George Peavyhouse, was introduced as a wit-
ness for plaintiff, and testified in part as fol-
lows:

"My name is George Peavyhouse, and I work
for the Gulf, Texas & Western Railway Com-
pany at Jermyn, Tex. I am situated at Jermyn,
and I work in the repair department, and I
have worked for the Gulf, Texas & Western
Railway Company for a number of years. I
had a pass over the road. On the day of Jan-
uary 15, 1920, about 10 o'clock a. m., we had
a· notice of wreck west of Olney, Tex., and
we were instructed to take the motorcar and
the section crew and go to the wreck. This
wreck was about 35 miles from Jermyn. We
went to the wreck, and got the car back on the
track about 5 or 6 o'clock in the afternoon.
Mr. Clark, the section foreman at Loving,
started back home in his motorcar. The freight
train followed him, and we followed the train.
We were about a mile and one-half behind the
freight train, and we could see the lights most
all of the time. We passed the town of Jean,
and we were going to Loving, and when we
got to the open crossing on Mr. Orr's land we
had· the accident with the mule.

"The night was very dark, and we had a
lantern set on the car, and we were using it
for signal ·purposes or to show the people that
we were coming down the track. Mr. Rhea
was driving the car, and was seated on the
left-hand side of the car. Mr. Howard was
.seated on the right side of the car opposite
Mr. Rhea. I was behind Mr. Rhea, and another
man set on the right hand side opposite me.
We did not see the mule on the track and could
not see him on account of the darkness. This
is a prairie country through which the railroad
runs and there is no hills to obstruct the view.
If it had been light we could have seen down the
track for 300 yards. We were traveling at the
rate of about 10 miles an hour, and were about
5 minutes behind the freight train. We did
not see the mule or know that he was any-
where about until the mule was on the top of
the car. I do not know whether we hit him,
or he attempted to jump us. We both hit about
the same time.· The mule was on top of the
car, and he jumped on the car from the south
side of the track. He injured the car, and it
would not run. We had to get out and do some
repair work before we could go on. The mule
injured Mr. Jordan's leg, but it was all right
before we left. We dumped the mule after
we crossed the stock guard, and the mule was
put off on the right of way. We tried to catch
the mule to see how badly he was injured, but
he would not let us. We then went on to Jer-
myn. There was hair on the front part of the
car."

Cross-examination:

"The motorcar that we were driving when the
accident occurred was about 8 feet long, 4 feet
wide, and about 3 feet high. The engine was
on the front part of the car, and the gasoline
tank sits on the back of the engine, which is
about 3 feet from the front to the back of the
gasoline tank. The men sit behind the gaso-

line tank. I examined the car after the mule was hit, and the front end of the car was not damaged at all, except one of the handle bars, which had some blood on it. The engine was not hurt, but on the top of the car the gasoline tank was badly dented, and there was a lot of blood and hair on the tank, and the throttle was bent. The mule jumped on the lap of Mr. Jordan, one of the men sitting in the front of the car. I do not know how the accident happened, as we did not see the mule until he was on top of the car. It is my opinion that we did not hit the mule, but that the mule was coming from the south, and got to the crossing the same time we got there, and he tried to jump the car.

"I have been in the employees' department of the railroad company for a number of years, and I have worked for the Gulf, Texas & Western Railway Company and the Rock Island Railway Company, and I have never seen a motor car equipped with lights, except one time when one of the employees at Jermyn had mounted a Ford light that was run by a storage battery on the motorcar. These cars are used for all kinds of work, and it was the usual custom to send them out at day or night, but they are made for day work. We were going at the rate of 8 or 10 miles an hour when we hit the mule. The car had a good brake on it, and should have been stopped easily. The car was making a lot of noise, the gasoline engine was running, and we did not have any muffler on it; the wheels made a great deal of noise running on the rails."

Mr. J. L. Rhea, introduced by the defendants, and who was also on the hand car at the time of the accident, testified as follows:

"My name is J. L. Rhea, and I live at Jermyn, Tex. I am section foreman for the Gulf, Texas & Western Railway Company at that place, and I have worked for the railroad company for the past 25 years, and I have worked for the Rock Island, Frisco, Katy, Southern Pacific and Louisville & Nashville roads. Most of my work has been on the section force as foreman. Never in my experience have I seen a motorcar equipped with headlights. These cars are made for day use, but they are used for the employees both in day time and at night. It is the universal custom to use these cars in the daytime, and when they are used in the night they usually have a lantern to make a signal. A motorcar is a hand car driven by a gasoline engine with a chain belt. It is about 8 feet long and 4 feet wide, and 2 feet high. The engine and the driver's seat are in the front on the left hand side. On January 15th there was a wreck west of Olney, Tex., on the Gulf, Texas & Western Railway Company railroad, and I was ordered to take the motorcar jacks and pulleys and go to the wreck. We went to the wreck, which was about 35 miles from Jermyn. We got the car back on the track about 5 or 6 o'clock in the afternoon, and started home. The motorcar was driven by Mr. Clark. We had a lantern sitting on the motorcar. The car is controlled by a throttle and hand brake, and they are situated just to the right of the driver.

"The night was very dark, and as we approached the open crossing we were running about the rate of 8 or 10 miles an hour; the brake on the motorcar was very good. It is slightly down grade, the engine was still running, but we were coasting down hill, making about 8 or 10 miles an hour. The lights that we had were not very strong, and we could not see down the track, and we were not using the light for that purpose. It was about 10 o'clock in the night when we got to this crossing, and we did not see the mule on the track, and could not see the mule on account of the darkness. If it had been light, we could have seen for about 400 yards ahead. The first thing we knew the mule was on top of the car, and do not know whether the mule struck us or we struck the mule. We carried him about 50 feet before he got off the car. I do not know whether I put on the brakes or not. I had never before had a mule to come out of the dark and sit down in my lap, and I was excited. I stopped the car as soon as the mule scrambled off the car or fell off the car. The car was injured, and would not run until we had done some patching on it. The throttle was all bent and twisted, and the gasoline tank was mashed. The man sitting just across from me had his leg injured pretty bad. We patched the car up, and we tried to catch the mule to see how badly he was injured. He was limping, but we could not catch him. After we got the car fixed we started to Jermyn. I do not know whether the mule was coming from the north or the south, or whether he stopped on the track, or whether he attempted to jump the car; but from all signs I do think that the mule was coming from the south, and tried to jump the car, as the front end of the car was not damaged, and the mule was on top of the car. In my opinion, if the car had hit the mule, it would have knocked him down, instead of on top of the car."

Cross-examination:

"I have never seen a motorcar equipped with lights. We had a motorcar, and it was equipped with just an ordinary hay barn lantern, and did not throw light very far, not more than 10 feet. We did not see the mule before he struck the car. He was injured in the left leg, and we do not know whether he jumped the car backwards or forwards. All we know is that he was on top of the car before we saw him. The crossings are not very thick along the Gulf, Texas & Western Railway line of road. One of the handlebars of the car was broken, and it was one of the front ones, and was on the south side of the track. I do not know whether the handlebars hit him or not but in my opinion it would have knocked him down rather than throw him on top of the car. I do not know whether the mule got his leg injured when the car struck him, or whether he received it when he fell out of the car. The mule kicked and scrambled on top of the car, and while he was on top of the car he had his legs mixed up with the hand brake and throttle. The throttle was all bent and twisted, and had to be fixed before we could go on.

"This was a very dark night, and we were going at the rate of about 10 miles an hour, and were 5 or 10 minutes behind the freight train, and we could see the lights now and then ahead of us. There was a light on the crossing."

Those were the only two witnesses testifying as to how the accident happened.

The evidence further shows that the accident happened while the railroad company was in the control of the Director General of Railroads, acting for and in behalf of the United States government, and the suit was not filed until the office of Director General of Railroads had been abolished and John Barton Payne had been appointed as Federal Agent to wind up the business of the Director General in the operation of the road. The suit was instituted against the railroad company and also against the "Director General of·Railroads under federal control," but without naming him. After its institution, J. Frank Knox, who, pending the suit, had been appointed receiver of the railroad company, made himself a party to the suit as a representative of the interests of the railroad company. John Barton Payne, the Federal Agent, was never made a party to the suit by any pleading of any character. But judgment was rendered against "John Barton Payne as Agent and Director General of Railroads in the United States of America, under government control," and also against the railroad company and its said receiver.

In plaintiff's petition it was alleged in general terms that at the time of the accident the hand car was being operated by the defendants in a negligent and careless manner, and that the mule was struck as a result of such negligence. The issue of negligence was submitted to the jury in the same general form, and an affirmative answer given thereto.

[1] The judgment against the railway company and its receiver must be set aside, since it is now, well settled, both by decisions of the United States Supreme Court and the Supreme Court of this state, that a judgment against a railway company upon a cause of action arising during such federal control and as a result of operations by the Director General is void. Schaff v. Mason (Tex. Sup.) 235 S. W. 520.

[2] Aside from the merits of the contention presented by John Barton Payne, Federal Agent, that a judgment could not be rendered against him in the absence of some pleading filed by the plaintiff praying for such relief, we have reached the conclusion that the evidence was not sufficient to establish the allegations of negligence which were made the basis of plaintiff's suit. Since the open crossing was established at plaintiff's special instance and request, the statute requiring the railroad company to fence its track and making it liable for stock killed in the absence of such fence, independent of the issue of negligence, does not apply. In other words, under the facts of this case, plaintiff has no cause of action against any one, in the absence of proof showing that the animal was killed as the result of negligence of the employees who were operating the hand car in question. In order to reach that conclusion it would be necessary to enter the domain of speculation. As noted, the testimony of plaintiff's own witness, as well as of defendants' witness, tends very strongly to show that the mule collided with the hand car while he was attempting to cross the track, and that he was not standing on the track in front of the car at the time he was struck. While the hand car had no headlight, it carried a lantern, giving light sufficient to be seen in time for the mule to have left the track if he had been on it before the car reached the crossing, and the evidence conclusively shows that the car was moving at a slow rate of speed, and was making a noise sufficient for the mule to hear its approach in time to leave the track, if in fact he was on it. Whether or not the mule was on the track and could have been seen by those operating the car in time to enable them to stop the car before reaching the crossing, and thereby have avoided the collision is left entirely to speculation. S. A. & A. P. Ry. Co. v. Aycock (Tex. Civ. App.) 68 S. W. 1001; G., H. & S. A. Ry. Co. v. Dyer (Tex. Civ. App.) 46 S. W. 841; Mahler v. M., K & T. Ry. Co. (Tex. Civ. App.) 90 S. W. 206; M., K. & T. Ry. Co. v. Baker, 99 Tex. 452, 90 S. W. 869; Butler v. Baker (Tex. Civ. App.) 226 S. W. 827.

Accordingly, the judgment against the railroad company and its receiver and John Barton Payne, as Director General, is reversed, and judgment is here rendered in favor of those defendants. The judgment against John Barton Payne as Federal Agent is also reversed, and as between him and the plaintiff the cause is remanded to the trial court, for further proceedings not inconsistent with the conclusions here reached.

Reversed and rendered in part, and reversed and remanded in part.